UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

EUGENE M. LaFLAMME and WORLD WIDE TOURS
OF MISSION VALLEY, INC., individually
and on behalf of all others similarly                    <u>**MEMORANDUM & ORDER**</u>
situated,                                                08-CV-1079 (KAM)

                    Plaintiffs,

          v.

SOCIÉTÉ AIR FRANCE, KONINKLIJKE
LUCHTVAART MAATSCHAPPIJ N.V., AMERICAN
AIRLINES, INC., DEUTSCHE LUFTHANSA AG,
and UNITED AIRLINES, INC.,

                    Defendants.

----------------------------------------X

**MATSUMOTO**, United States District Judge:

          In their Second Amended Complaint ("Complaint"),

plaintiffs Eugene M. LaFlamme and World Wide Tours of Mission

Valley, Inc. (collectively, "plaintiffs"), individually and on

behalf of all others similarly situated, allege that Société Air

France ("Air France"), Koninklijke Luchtvaart Maatschappij N.V.

("KLM"), Deutsche Lufthansa AG ("Lufthansa"), and United Air

Lines, Inc. ("United"), all international air carriers

(collectively, "defendants"),[1] of conspiring to fix prices for

_____

[1]     Although the Second Amended Complaint also originally named American
Airlines ("American") as a defendant, American is no longer a party to this
action pursuant to a Stipulated Order of Voluntary Dismissal Without
Prejudice dated February 17, 2009. (See Doc. No. 48.)

                                   1

air passenger fares and passenger fuel surcharges[2] on

transatlantic flights between the United States, Germany, and

various other transatlantic destinations within the European

Union, during the period between August 2004 and June 2006 in

violation of the Sherman Antitrust Act ("Sherman Act"), 15

U.S.C. § 1 ("Section 1").  Through their Complaint, plaintiffs

plead a single count of Sherman Act Section 1 liability against

all defendants and claim that because of defendants' unlawful

conduct, plaintiffs and other members of a putative class paid

artificially inflated fares and surcharges for transatlantic

flights and are therefore entitled to, *inter alia*, injunctive

relief and treble damages.  All defendants move to dismiss the

Complaint for failure to state a claim pursuant to Federal Rule

of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), and alternatively

to dismiss certain claims for lack of subject matter

jurisdiction pursuant to Federal Rule of Civil Procedure

12(b)(1) ("Rule 12(b)(1)").[3]  Additionally, United moves

---

[2]     The Complaint defines surcharges as "fees charged to passengers by airlines purportedly to compensate the airlines for increased fuel and other costs."  (Doc. No. 17, Second Amended Complaint ("Compl.") ¶ 1.)

[3]     The parties have submitted the following briefs in connection with all defendants' motions to dismiss: Doc. No. 57, Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("Defs. Mem."); Doc. No. 58, Declaration of Ruth E. Harlow in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("Harlow Decl."); Doc. No. 64, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("Pls. Mem."); Doc. No. 63, Declaration of William B. Scoville, Jr. in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("Scoville Decl."); Doc. No. 59, Reply Memorandum of

2

separately to dismiss the claims against it on the grounds that the Complaint asserts a claim that was discharged by United's 2006 emergence from bankruptcy.[4]

For the reasons that follow, defendants' Rule 12(b)(6) motions are granted and this case is dismissed because plaintiffs' Complaint fails to state a claim. The court thus finds it unnecessary to address either defendants' alternative motion to dismiss under Rule 12(b)(1) or United's alternative motion to dismiss based on its bankruptcy.

## BACKGROUND

A court considering a motion to dismiss pursuant to Rule 12(b)(6) must accept all factual allegations of a complaint as true, but need not give any effect to legal conclusions couched as factual allegations. <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (2d Cir. 2010). The well-pleaded factual allegations of the Complaint are as follows.

---

Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("Defs. Reply Mem."); Doc. No. 73, Plaintiff's Letter dated 2/4/10 ("Pls. 2/4/10 Ltr."); and Doc. No. 74, Defendants' Letter dated 2/8/10 ("Defs. 2/8/10 Ltr.").

[4]     The parties have submitted the following briefs in connection with United's alternative motion to dismiss: Doc. No. 52, Brief of Defendant United Air Lines, Inc. in Support of Motion to Dismiss the Second Amended Complaint; Doc. No. 65, Plaintiff's Memorandum of Law in Opposition to Defendant United Air Lines, Inc.'s Motion to Dismiss the Second Amended Complaint; Doc. No. 56, Defendant United Air Lines' Reply Memorandum of Law in Support of Motion to Dismiss the Second Amended Complaint.

According to the Complaint, plaintiffs represent a
putative class numbering "at least in the hundreds-of-
thousands," consisting of "all persons and entities . . . who
purchased [p]assenger [a]ir [t]ransportation and paid passenger
surcharges that included at least one direct flight segment
between the United States, Germany, and other transatlantic
European Union destinations directly from Defendants" in the
period between August 2004 and June 2006 (the "class period").
(Compl. ¶¶ 23, 24.)  Both named plaintiffs, Eugene M. LaFlamme,
a Wisconsin resident, and World Wide Tours of Mission Valley,
Inc., a travel agency incorporated and doing business in
California, claim to have purchased air passenger fares directly
from one or more defendants and paid the related surcharges on
airfare between the United States and certain transatlantic
destinations during the class period.  (Id. ¶¶ 10-11.)

Defendants are international airline carriers.  (Id.
¶¶ 12-16.)  Each defendant is also a member of the International
Air Transport Association ("IATA"), a trade organization that
includes most of the world's international airlines and which
was "established to enable members to discuss and agree upon
international rates and fares for scheduled cargo and passenger
transportation services."  (See id. ¶ 32; see also Scoville

Decl. Ex. 8 (DOT Order 2006-7-3) at 1, 3.)[5]  Defendants are also

each members of various Global Alliances with other domestic and

foreign airlines.  (Compl. ¶¶ 42-48.)

### A.    Immunized IATA and Global Alliance Activity

As part of its mission to coordinate international

airline service, the IATA conducts tariff conferences where

competing airline members discuss the passenger fares and

surcharges they wish to charge for international markets and

establish proposed fares and rates by passing resolutions.

(Compl. ¶¶ 32-34; Scoville Decl. Ex. 8 at 1, 3.)  During the

putative class period, IATA and its member airlines received

limited U.S. antitrust immunity from the United States

Department of Transportation ("DOT") to conduct tariff

conferences.  (Compl. ¶¶ 33, 37, 43; Scoville. Decl. Ex. 8 at

1.)  The various Global Alliances to which defendants belong

also received limited antitrust immunity from DOT.  (Compl. ¶¶

---

[5]    In accordance with the well-settled law of this Circuit, along with the
Complaint, in deciding this Rule 12(b)(6) motion to dismiss, the court will
consider those documents submitted by the parties which are matters of public
record or which are deemed included in the Complaint.  See Pani, M.D. v.
Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998) (noting that it
is "well-established" that a court may rely on matters of public record in
deciding a Rule 12(b)(6) motion to dismiss); see also Sira v. Artuz, 380 F.3d
57, 67 (2d Cir. 2004) (noting that a court deciding a motion to dismiss under
Rule 12(b)(6) may consider all documents included in the complaint whether by
attachment as an exhibit, through incorporation by reference, or because the
documents are "integral" to the pleading) (internal citations omitted).
However, as discussed further infra, note 18, the court declines to consider
those documents submitted by plaintiffs to support allegations first raised
in their motion papers and found nowhere in the Complaint.  See, e.g., Wright
v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir. 1998) (noting a party is not
entitled to amend pleadings through statements made in motion papers).

42-48.)  The limited immunity for both IATA tariff conferences
and the airlines' Global Alliances applied under certain
conditions.  (See id. ¶¶ 33, 37, 44.)

Among other things, in order to maintain the tariff
conference antitrust immunity, the IATA or the member airlines
were required to submit all tariff conference resolutions and
other agreements to DOT for approval and to withhold
implementation of any such resolution or agreement until DOT
approval was granted.  (Id. ¶ 37; Scoville Decl. Ex. 8 at 15.)
However, by order dated March 30, 2007 and effective June 30,
2007, DOT prospectively terminated this limited antitrust
immunity for fare coordination on transatlantic routes without
altering the immunity existing prior to the effective date.
(See Harlow Decl. Ex. B (DOT Order 2007-3-23) at 2-3; see also
Compl. ¶ 44 (citing DOT Order 2007-3-23).)  Additionally, to
preserve both IATA and Global Alliance antitrust immunity, the
airline carriers were required to refrain from participating in
IATA tariff conference discussions involving routes between the
United States and the home countries of their Global Alliance
partner airlines.  (Compl. ¶¶ 33, 43-44.)

**B.   Alleged Agreement Regarding Resolution 001w and Surcharge Adjustments**

Plaintiffs allege that defendants and others unlawfully conspired in July 2003 to fix fuel surcharges on transatlantic air passenger flights by agreeing, without DOT approval, to implement an IATA resolution known as "Resolution 001w."[6]   (Id. ¶¶ 70, 88.)   According to the Complaint, Resolution 001w was introduced in July 2003 at an IATA tariff conference in Geneva, Switzerland ("July 2003 IATA Tariff Conference"), and had an intended effective date of April 2004.   (Compl. ¶¶ 58, 62, 63.)   Resolution 001w proposed an air passenger surcharge facility that would include "fuel insurance and security applied by components to be prorated by all participating air carriers." (Id. ¶¶ 58, 60, 62.)

According to its publicly filed DOT Application, Resolution 001w was designed not as a "limitation" on airlines, but as a means to facilitate "the application of interline fares worldwide [by] applying surcharges that have been adopted by individual airlines."   (See Harlow Decl. Ex. E (2003 IATA Application, Docket OST-2003-_) ("DOT Resolution 001w Application").)   Specifically, the terms of Resolution 001w: (i)

---

[6]    The court notes that while plaintiffs allege a conspiracy involving both passenger fares and surcharges (Compl. ¶ 1), the sole agreement alleged in the Complaint involved Resolution 001w, which plaintiffs allege concerned only fuel surcharges (Compl. ¶¶ 60, 62, 70).

proposed a procedure by which carriers could make a filing with IATA to change existing surcharges or introduce new surcharges; (ii) identified the required contents for such a proposed filing; (iii) permitted proposed surcharges in the form of "a percentage of the fare, tiered, capped or flat rate"; and (iv) placed the onus on the filing carrier to obtain any necessary government approvals. (See id.)

At the July 2003 IATA Tariff Conference, Resolution 001w was adopted by the IATA pending government approvals and later submitted to DOT for approval of antitrust immunity. (Id. ¶¶ 58, 62, 67; see also DOT Resolution 001w Application.) Defendants Air France, KLM and Lufthansa voted in principle to support Resolution 001w. (Compl. ¶ 64.) United expressed opposition to Resolution 001w on grounds that it was concerned the resolution would not be able to obtain DOT approval and would not fulfill carrier needs, but it ultimately indicated that it would abstain from voting on the Resolution. (Id. ¶ 65.) The request for DOT approval of Resolution 001w was withdrawn in 2007 prior to any DOT determination on the issue. (Id. ¶¶ 67-71.)

The Complaint alleges that despite the lack of DOT approval, "[i]t appears that Defendants and others decided to

adopt the terms of Resolution 001w during May and August 2004."[7]

(Id. ¶ 70.)  The Complaint does not contain any specific

allegations about which defendants or which other parties

"decided" to adopt the terms of Resolution 001w absent DOT

approval, or when, where, how, or whether this decision was

collectively agreed to.[8]  (See id.)

The Complaint then alleges that IATA convened another

tariff conference on May 28, 2004 ("May 2004 IATA Tariff

Conference"), and at that meeting "additional proposals to adopt

coordinate and/or adjust air passenger surcharges on a worldwide

basis . . . were discussed."  (Id. ¶ 75.)  According to the

Complaint, during that discussion various IATA members,

including defendants Lufthansa and United, asserted conflicting

views regarding the amounts and methods of deriving proposed air

passenger surcharges.  (Id.)  Although illustrating the

---

[7]     In what appears to be an alternative argument, in their motion papers,
but not in their Complaint, plaintiffs also contend that apparently aside
from agreeing to implement Resolution 001w without DOT approval as alleged in
the Complaint, (¶ 70), defendants used the IATA discussions of Resolution
001w as a "pretextual device for a much deeper level of pricing discussions
and agreements that were never submitted to the DOT, never received
governmental approval, and never received DOT antitrust immunization."  (See
Pls. Mem. at 21.)  Plaintiffs do not allege what specific agreement, if any,
resulted from such "discussions" or whether such agreement, if one existed,
was ever implemented.

[8]     The Complaint later alleges that the defendants went forward with
charging uniform surcharges even without DOT approval "as previously agreed
upon" during the July 2003 IATA Tariff Conference, apparently in reference to
the adoption of Resolution 001w.  (See Compl. ¶¶ 70, 72.)  Although
plaintiffs allege that "it appears that [d]efendants . . . decided to adopt
the terms of Resolution 001w during May and August 2004 absent DOT approval,"
(Compl. ¶ 70), plaintiffs do not allege that the defendants actually agreed
to do so at the July 2003 Tariff Conference or at any later date.

*disagreement* between the various IATA members about possible passenger fuel surcharge adjustments, the Complaint does not allege that the IATA members or defendants reached any agreement on the issue at the May 28, 2004 tariff conference.[9]  (Id.)

The Complaint later refers to the defendants' implementation of "planned" adjustments to transatlantic passenger surcharges without identifying when, where, and by whom such adjustments were "planned."  (Id. ¶ 80.)  Presumably, the Complaint intends to imply that the adjustments were "planned" at the May 2004 IATA Tariff Conference.  (See id.; see also Pls. Mem. at 7-8.)

Finally, the Complaint alleges that "[c]ertain IATA carrier members also appear to have agreed to cancel passenger surcharges if the market price for oil dropped below a collar for a fixed amount of time."  (Compl. ¶ 81.)

## C.    Subsequent Alleged Parallel Conduct and Alleged Further Discussion

The Complaint alleges that despite the absence of DOT approval for Resolution 001w, in May 2004, shortly after the Resolution's proposed effective date, Air France, KLM, United, and other non-parties began to implement fuel surcharges or surcharge adjustments.  (Id. ¶ 73.)  Specifically, the Complaint

_____

[9]     However, plaintiffs' motion papers characterize these discussions as a "meeting of the minds" regarding surcharge amounts.  (Pls. Mem. at 8.)

alleges that on May 16, 2004, Air France implemented a surcharge of 3 Euros ($3.56); and on May 18, 2004, KLM implemented a surcharge of 5 Euros ($6.01); while on May 27, 2004, United increased its existing surcharge by upwards of $10 U.S. (Id.; see also Defs. Mem. at 5.)[10] The Complaint also alleges that sometime after May 28, 2004, American and other members of the OneWorld Alliance re-introduced passenger fuel surcharges in unspecified amounts. (Compl. ¶ 77.)

Additionally, the Complaint alleges that non-parties British Airways and Virgin Atlantic, as well as certain defendants made "planned adjustments" to transatlantic passenger surcharges in August and September 2004. (See id. ¶ 80.) Specifically, the Complaint alleges that in August and September 2004, defendants and other non-parties such as TAP Air, Czech Air CSA, and Olympic Air adopted or adjusted passenger surcharges in varying amounts ranging from 5 to 15 Euros ($6.09 to $18.21 USD).[11] (Id. ¶¶ 73, 80; see also Defs. Mem. at 5.)

Additionally, the Complaint alleges that other co-conspirators, who are not parties to this action, also

_____

[10]    The allegations in the Complaint refer to various currencies. For ease of comparison, the court cites both the Complaint's figures as well as defendants' calculations of those figures in equivalent United States dollars at the relevant time (Defs. Mem. at 5) which are undisputed by plaintiffs (see generally Pls. Mem.).

[11]    Plaintiffs have not disputed defendants' calculation that at the relevant time, 5-15 Euros was equivalent to $6.09 - $18.21 USD. (See Compl. ¶¶ 73, 80; see also Defs. Mem. at 5.)

implemented surcharges and adjustments of varying amounts during
the period between May 13 and September 4, 2004.  (Compl. ¶¶
73, 80.)  The Complaint contains no allegations that defendants
or others implemented any fuel surcharge facility or that the
surcharges imposed by defendants adhered to any sort of fuel
index.[12]  (See generally Compl.)

    The Complaint alleges that in May 2004, a single
airline, United, implemented fare increases for long-haul
passenger fares and blamed higher jet fuel costs for the
increases.  (Id. ¶ 74.)  Additionally, citing media reports
dated June 7, 2004, the Complaint alleges that following the May
28, 2004 IATA tariff conference Lufthansa announced a 3% upward
adjustment of fares as of July 1, 2004 along with two other
unidentified airlines announcing adjustments between 3-7%.  (Id.
¶ 77.)

    Finally, the Complaint alleges that defendants Air
France, KLM and Lufthansa reduced their passenger surcharges in
unspecified amounts during the fourth quarter of 2006 when fuel
prices had fallen for thirty consecutive days from the $75 per
barrel mark.  (Id. ¶ 82.)

---

[12]    However, plaintiffs' motion papers make allegations, again not
contained in the Complaint, asserting that at a July 2005 IATA Tariff
Conference, "air carriers agreed to resume distribution of an 'index for fuel
prices'" without alleging the actual existence or use of such an index.
(Pls. Mem. at 8-9 (citing Scoville Decl. Ex. 5), 12.).

**D. Evidence of Other Allegedly Anticompetitive Conduct**

The Complaint also contains allegations of other allegedly anticompetitive conduct by certain defendants and other non-parties to this action, including allegations that certain defendants and others are or were under investigation by various U.S. and foreign bodies in connection with possible antitrust violations.

**1. Alleged Anticompetitive Conduct Related to Global Alliances**

The Complaint claims that at unspecified times during the class period, defendants participated in IATA discussions for fares and surcharges on routes between the U.S. and the home countries of Global Alliance partner airlines in violation of their limited DOT antitrust immunity. (Id. ¶¶ 44-45.)

**2. Air Cargo Surcharges**

Although not at issue in the instant action, the Complaint discusses at some length IATA members' past alleged attempts to adopt a fuel surcharge pricing index for air cargo rates through enactment of IATA "Resolution 116ss." (Id. ¶¶ 49-57.) Resolution 116ss proposed the use of a standardized fuel index to aid in the implementation and adjustment of fuel surcharges on air cargo rates, and was submitted to DOT for antitrust immunity approval. (Id. ¶¶ 49, 56; see also Pls. Mem. at 3.) However, the Complaint alleges that prior to a DOT

determination on immunity for Resolution 116ss, a fuel index was provided to IATA members at a tariff conference in February 2000, and that in the early part of that year "certain air carriers went forward with their agreement to adopt air cargo surcharges." (Compl. ¶¶ 50, 51, 54.) The Complaint further alleges that "many of the same air carriers that adopted air cargo surcharges" have pled guilty to charges brought by the United States Department of Justice ("DOJ") that they conspired to fix prices on air cargo services and surcharges in violation of the Sherman Act. (Id. ¶¶ 54-55.)

Additionally, the Complaint alleges that after DOT denied immunity for Resolution 116ss, certain "IATA air carrier members discussed methods to get around" that denial. (Id. ¶¶ 56, 57.) Plaintiffs also claim that during the early part of 2000, defendants participated in concurrent discussions at IATA meetings regarding both air cargo and passenger surcharges. (Id. ¶ 54.) Finally, the Complaint notes that in May 2000, David Short, an individual involved in IATA's Legal Department, allegedly advised IATA air carrier members that they must avoid the appearance of "conscious parallelism" in connection with air cargo surcharges. (Id. ¶ 57.)

###     3.    Other Antitrust Investigations

The Complaint notes that in June 2006, United received a subpoena from DOJ requesting information related to pricing of air passenger fares and surcharges on international routes. (Id. ¶¶ 16, 89.)  Similarly, in May 2007, the United States Federal Bureau of Investigation served subpoenas on various airlines (notably the Complaint does not specify any defendant) at a May 2007 IATA meeting and interviewed various unidentified airline managers.  (Id. ¶ 90.)

Further, the Complaint alleges in August 2007, the DOJ charged IATA members Korean Airlines and British Airways with violations of the Sherman Act, and the two airlines each pleaded guilty to conspiring with rivals to fix passenger fares and surcharges during what appeared to be, according to the Complaint, the same August 2004 timeframe when many IATA members adjusted or adopted passenger surcharges.  (Id. ¶ 91.)  Notably, public records identified by defendants make clear that the guilty plea by Korean Airlines[13] solely involved flights between the United States and Korea, and the guilty plea by British

---

[13]    See Plea Agreement, ¶ 4(b)(ii), United States v. Korean Air Lines Co., Ltd., Crim No. 07-184 (JDB) (D.D.C. Aug. 1, 2007) available at http://www.usdoj.gov/atr/cases/f225500/225524.htm.

Airways[14] involved flights between the United States and the United Kingdom and its collusion with a single "co-conspirator" elsewhere identified[15] as Virgin Atlantic Airways.

The Complaint also references investigations and charges involving defendants and others carried out by other global antitrust authorities. For example, the Complaint alleges that the European Commission investigated defendants Lufthansa, Air France and KLM in March 2008 in connection with price fixing on routes between Europe and Japan. (Id. ¶ 92.) Similarly, the Complaint alleges that in April 2008 Brazilian antitrust authorities charged United with violations of Brazilian law relating to air cargo surcharges. (Id. ¶ 93.)

## DISCUSSION

### I.  Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint based on allegations which fail "to state a claim upon which relief can be granted." When attacked on a Rule 12(b)(6) motion to dismiss, "[o]nly a complaint that states a *plausible* claim for relief survives . . . ." Ashcroft

---

[14]    See Plea Agreement, ¶ 4(b)(ii), United States v. British Airways PLC, Crim No. 07-183 (JDB) (D.D.C. Aug. 23, 2007) available at http://www.usdoj.gov/atr/cases/f225500/225523.htm.

[15]    See Press Release, DOJ, at 2 (Aug. 1, 2007), available at http://www.usdoj.gov/opa/pr/2007/August/07_at_569.html.

*v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (emphasis added). The Supreme Court and Second Circuit have provided guidance about the general contours of a "plausible claim for relief" at the pleading stage and the appropriate standards for determining whether such a claim has been sufficiently stated in the context of a Sherman Act antitrust claim. *See, e.g.*, *id.*; *see also* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Starr*, 592 F.3d 314.[16]

### A.     Legal Standard

#### 1.     Pleading Standards Generally

Pursuant to Federal Rule of Civil Procedure 8(a)(2), a pleading must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief[.]" While Rule 8's requirement of a "short and plain statement" obviates the need for detailed factual allegations at the pleading stage, "[t]o survive a motion to dismiss, a complaint must contain

---

[16]    The court notes that the briefs of counsel on the present motion, filed in March 2009, cite and discuss *Twombly*, 550 U.S. 544, but do not discuss *Iqbal*, 129 S. Ct. 1937, which was decided in May 2009. However, neither party requested leave of the court to discuss *Iqbal* in a supplemental brief, nor did the court request additional briefing. However, the court notes that although *Iqbal* further clarified the principles enunciated in *Twombly* and that those principles apply to "all civil actions," as opposed to antitrust actions, *Iqbal* did not alter or add any new concept to the *Twombly* principles. *See* 129 S. Ct. at 1953 (internal quotation and citation omitted). Both parties, however, submitted letter briefs construing the Second Circuit's recent holding in *Starr*, 592 F.3d 314, as further support for their respective positions. (*See* Pls. 2/4/10 Ltr.; Defs. 2/8/10 Ltr.) This opinion considers all three decisions in light of the record before the court.

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570).

The facial plausibility standard is met when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. Such factual content must consist of more than mere labels, legal conclusions, or a "formulaic recitation of the elements of a cause of action." See id. at 1949-50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (internal citations omitted). This does not require a showing of a "probability" of misconduct, but it does demand more than "a sheer possibility that a defendant has acted unlawfully." See id. at 1949.

Indeed, a well-pleaded complaint may survive a motion to dismiss even where "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556 (citations and internal quotation omitted). However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate. Starr, 592 F.3d at 321 (quoting Iqbal, 129 S. Ct. at 1950); see also

Twombly, 550 U.S. at 570 ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

Assessing whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950. In conducting such an assessment on a Rule 12(b)(6) motion to dismiss, it is well-settled that a court must "assume [the] veracity" of all well-pleaded factual allegations contained in the complaint, id., 129 S. Ct. at 1950, and afford the plaintiff every reasonable inference, see Zinermon v. Burch, 494 U.S. 113, 118 (1990). However, allegations amounting to no more than bare legal conclusions are "not entitled to the assumption of truth." Iqbal, 129 S. Ct. at 1950.

### 2.  Pleading Standards for Sherman Act § 1 Claims

The Supreme Court in Twombly discussed the application of these general principles to a Sherman Act Section 1 claim. See Twombly, 550 U.S. at 556. Section 1 of the Sherman Act proscribes "every contract, combination . . . or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1. Because Section 1 of the Sherman Act does not prohibit all restraints of trade, but rather only *agreements* to restrain trade, "[t]he

19

crucial question in a Section 1 case is therefore whether the challenged conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" Starr, 592 F.3d at 321 (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954)).

Thus, in order to state a viable Section 1 claim, a complaint must provide "enough factual matter (taken as true) to suggest that an agreement was made." Twombly, 550 U.S. at 556. A plausible suggestion of agreement can be derived from specific allegations of actual agreement among defendants. See id. at 565 n.10. Additionally, a plausible suggestion of agreement may be derived from allegations of parallel conduct. See id. at 564-65. However, as the Supreme Court noted, alone, "lawful parallel conduct fails to bespeak unlawful agreement . . . [and] an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." Twombly, 550 U.S. at 556-57. Accordingly, to survive a motion to dismiss, a Sherman Act Section 1 complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. at 556.

20

**B.     Application**

Plaintiffs principally contend that their Complaint gives rise to a plausible inference of illegal agreement in three ways: (1) allegations of actual agreements made at antitrust-immunized IATA meetings; (2) allegations of parallel conduct; and (3) evidence suggesting other anticompetitive conduct by defendants and others in the United States and abroad.  Under any of these methods, plaintiffs' allegations fail to plausibly suggest an agreement, and are therefore insufficient to state a claim under Section 1 of the Sherman Act.

**1.     Conclusory Allegations of Agreement at Antitrust-Immunized IATA Meetings**

Plaintiffs contend that the Complaint contains direct evidence of conspiracy.  (Pls. Mem. at 1-2, 16-18.) Specifically, plaintiffs contend that the allegations of "joint discussion" of surcharges under the guise of Resolution 001w at the July 2003 IATA Tariff Conference and the subsequent alleged implementation of Resolution 001w by defendants and others comprise enough direct evidence to state a plausible claim for relief.[17]  (See Pls. Mem. at 18; see also Compl. ¶ 70 ("It

_____

[17]     Plaintiffs also allege that a 3% fare increase announced by a single defendant allegedly "in line with IATA adjustments" is "direct evidence" of conspiracy.  (Compl. ¶ 77; see also Pls. Mem. at 8 ("A few days after discussing the 3% increase with the other Defendants . . . Lufthansa announced that it would implement the 3% increase 'in response to the oil

appears that [d]efendants and others decided to adopt the terms of Resolution 001w during May and August 2004 absent U.S. DOT approval.") and ¶ 72 ("Defendants went forward without U.S. DOT approval and began to uniformly charge passenger surcharges as previously agreed upon during the July 2003 IATA meeting in Geneva.").) The court disagrees.

At the outset, the court notes that plaintiffs are incorrect in their contention that the <u>Twombly</u> plausibility standard does not apply to their allegations of direct evidence of conspiracy (Pls. Mem. at 2, 16). <u>See</u> <u>Iqbal</u>, 129 S. Ct. at 1953 ("<u>Twombly</u> expounded the pleading standard for 'all civil actions'") (quoting <u>Twombly</u>, 550 U.S. at 555-56 and n.3). Rather, the allegations that the meetings and discussions which took place at the July 2003 Tariff Conference constitute direct evidence of a price-fixing agreement must meet the standard of "facial plausibility" set forth in <u>Twombly</u>. <u>See</u> <u>Twombly</u>, 550 U.S. at 570. Plaintiffs' allegations fail to do so for three reasons.

---

price increase and to the latest recommendation by the [IATA].").) The Complaint does not allege whether or when any 3% fare increase was implemented, if ever, either by any defendant or any other party. Because a conspiracy necessarily involves more than a single participant, and because the Complaint fails to articulate how the isolated announcement of a sole defendant can constitute direct evidence of conspiracy, the court declines to further consider this argument.

First, plaintiffs' purported "direct evidence" of agreement is based on a bald, conclusory allegation that "it appears that [d]efendants and others decided to adopt the terms of Resolution 001w during May and August 2004 absent U.S. DOT approval." (Compl. ¶ 70.) Indeed, plaintiffs fail to allege any specific facts providing any basis to infer an actual unlawful agreement by defendants to implement Resolution 001w without DOT approval. (See Compl. ¶¶ 70, 72.) Such conclusory allegations are not entitled to the presumption of truth by a reviewing court deciding a Rule 12(b)(6) motion to dismiss.[18] See Iqbal, 129 S. Ct. at 1951 ("the conclusory nature of respondent's allegations . . . disentitles them to the presumption of truth"). Moreover, such allegations fail to identify any specifics regarding the claimed illegal agreement

---

[18]    The Complaint itself contains only one allegation of direct evidence of illegal agreement. (See Compl. ¶ 88 ("But for [d]efendants' anti-competitive conduct . . . [d]efendants would have been unable to implement the July 2003 agreement and increase and sustain the prices of their fares and passenger surcharges.").) Yet plaintiffs' motion papers attempt to characterize the discussions at the May 2004 IATA Tariff conference as a "meeting of the minds" regarding the imposition of surcharge adjustments. (Compare Compl. ¶ 75-77 and Pls. Mem. at 8.) Thus, it appears that plaintiffs' motion papers may also intend to offer the May 2004 IATA Tariff Conference discussion of fuel surcharges as additional direct evidence of conspiracy. However, the court disregards these allegations which are first raised in plaintiffs' motion papers because it is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss. See, e.g., Wright, 152 F.3d at 178. Similarly, the court cannot consider plaintiffs' conclusory arguments regarding the alleged agreement to circulate a passenger fuel surcharge price index which is first raised in their briefs and nowhere discussed in the Complaint. (Compare Compl. and Pls. Mem. at 8-9, 12, 21-22.) Regardless, even had such allegations been included in the Complaint, they would still be insufficient to state a plausible claim for relief, as discussed fully *infra*.

as Twombly contemplates.  See Starr, 592 F.3d at 325 (noting in

dicta that allegations in a Sherman Act § 1 complaint based on

direct evidence of agreement would likely require references to

"'specific time, place, or person involved in the alleged

conspiracies'") (quoting Twombly, 550 U.S. at 565 n.10).

        Second, to the extent plaintiffs suggest that

defendants did not actually agree to implement Resolution 001w

absent DOT approval but instead used discussions surrounding

Resolution 001w as an "avenue" to conspire to fix fuel surcharge

prices, their bald argument fails to give rise to a plausible

inference of conspiracy.  The court notes as an initial matter

that membership and participation in a trade association alone

does not give rise to a plausible inference of illegal

agreement.  See, e.g., Twombly, 550 U.S. at 567 n.12 (rejecting

inference of conspiracy based upon mere participation in an

industry trade association); In re Elevator Antitrust Litig.,

No. 04-CV-1178 (TPG), 2006 U.S. Dist. LEXIS 34517, at *30-31

(S.D.N.Y. May 30, 2006) ("allegation that elevator company

executives attend trade, industry, or social functions together

is clearly insufficient to state a claim") aff'd 502 F.3d 47 (2d

Cir. 2007).

        Thus the critical issue here, and the crux of

plaintiffs' Complaint, is the allegation that defendants

24

violated their limited antitrust immunity by using the July 2003
IATA Tariff Conference to conspire secretly to implement
Resolution 001w without DOT approval or as an avenue to conspire
generally about surcharges.  (Compl. ¶¶ 3, 49-88; see also Pls.
Mem. at 16-18.)  This necessarily raises an issue about the
scope of the limited antitrust immunity afforded to defendants'
IATA activities by DOT.

Plaintiffs contend that it would be improper to
consider the scope of defendants' IATA immunity at the 12(b)(6)
stage because the Second Circuit has held that qualified
immunity defenses "cannot _ordinarily_ support dismissal under
Fed. R. Civ. P. 12(b)(6)."  (Pls. Mem. at 14 (quoting Liffiton
v. Keuker, 850 F.2d 73, 76 (2d Cir. 1988)) (emphasis added)).
Certainly, plaintiffs are correct that most immunities are
affirmative defenses, and as such, not ordinarily considered at
the pre-answer stage.  See, e.g., McKenna v. Wright, 386 F.3d
432, 435 (2d Cir. 2004) (noting that qualified immunity is an
affirmative defense "normally asserted in an answer" and
observing that "'_usually_, the defense of qualified immunity
cannot support the grant of a [Rule] 12(b)(6) motion'") (quoting
Green v. Maraio, 722 F.2d 1013, 1018 (2d Cir. 1983)) (emphasis
in quoting authority); see also 2 Moore's Federal Practice-Civil
§ 8.08[5] (Mathew Bender 3d ed.) (noting that affirmative

defenses "have been found to include common law immunity, statutory immunity, [and] exemption under a statute or regulation").

Nonetheless, plaintiffs' blanket assertion that defendants' immunity cannot properly be considered at the motion to dismiss stage is unsupported by the case law. Indeed, the Second Circuit has "broadly stated" that "an affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint." McKenna, 386 F.3d at 436 (internal citation and quotation omitted). Further, the Second Circuit has noted that it has allowed a qualified immunity defense to be "successfully asserted in a Rule 12(b)(6) motion on at least two occasions" where "the complaint itself established the circumstances required as a predicate to a finding of qualified immunity." Id. at 435 (internal citation and quotation omitted). A plaintiff, however, is entitled to all reasonable inferences from the facts alleged that defeat the immunity defense. Id. at 436.

Here, the Complaint on its face asserts facts as to the immunized nature of defendants' discussion of fuel surcharges at the July 2003 IATA Tariff Conference. (See Compl. ¶¶ 33-34, 37, 67.) It is undisputed that during the relevant

26

time period, defendants' attendance at and participation in the IATA trade association meetings enjoyed limited antitrust immunity under federal law so long as the defendants submitted any proposed resolutions and agreements to the DOT for approval and received approval prior to implementation. (See Compl. ¶¶ 33-34, 37; see also Pls. Mem. at 11 (" . . . Defendants' IATA participation immunity is predicated on the submission and approval of all agreements reached at IATA to the U.S. Department of Transportation prior to their implementation.").) It is also undisputed that here, the IATA and defendants followed that mandatory protocol when discussing and voting on Resolution 001w and then submitting it to DOT for approval prior to its contemplated implementation. (See Compl. ¶ 67.) Thus, the Complaint itself recites defendants' adherence to the protocols which are the predicates to a finding of immunity, and the court concludes as a matter of law that defendants' *discussions* of fuel surcharges at the IATA tariff conferences prior to June 30, 2007 were immunized. (See generally U.S. DOT Order 2007-3-23 at 1-3, attached as Ex. B to Scoville Decl. (discussing exemption under United States antitrust laws for IATA tariff conferences occurring prior to June 30, 2007).)

Therefore, the allegations that defendants discussed fuel surcharges in connection with Resolution 001w at an IATA

meeting do not plausibly suggest an illegal agreement because
such immunized conduct cannot be the basis for antitrust
liability.  See Pani, 152 F.3d at 74-75 (permitting immunity
defense to be asserted on a Rule 12(b)(6) motion to dismiss
because the facts supporting the defense "appeared on the face
of the complaint"); see also Green, 722 F.2d at 1018 (finding
qualified immunity defense a proper basis for dismissal on Rule
12(b)(6) motion).

        Third, even assuming that defendants secretly agreed
at the July 2003 IATA Tariff Conference to implement Resolution
001w without DOT approval – a notion which is rendered even more
implausible by the fact that the Complaint nowhere alleges that
any actual facility was implemented – plaintiffs fail to make
any allegations tending to show that such an agreement could
constitute an illegal agreement to fix prices under the Sherman
Act as alleged in the Complaint.  Rather, as plaintiffs'
Complaint makes clear, Resolution 001w was an "air passenger
surcharge facility."  (See Compl. ¶ 60.)  As such, Resolution
001w proposed a means for airlines on interline (multi-carrier)
fares to prorate existing or future fuel surcharges implemented
by individual airlines.  (See DOT Resolution 001w Application
(describing Resolution 001w as a means to "facilitate[] the
application of interline fares worldwide applying surcharges

28

that have been adopted by member airlines").)  Indeed, IATA

documents reveal that Resolution 001w did not set or adjust fuel

surcharge rates or amounts, or even set a process for

determining uniform surcharge amounts.  (See id. (noting that

Resolution 001w "is by no means a limitation on airlines").)

Accordingly, even if defendants were sufficiently alleged to

have agreed to implement Resolution 001w without DOT approval in

violation of the defendants' limited antitrust immunity,

plaintiffs have failed to allege facts establishing how such an

agreement would constitute a price-fixing agreement in violation

of Section 1 of the Sherman Act.[19]

In short, after sweeping away the conclusory

allegations of conspiracy forbidden by Twombley and Iqbal, as

well as the allegations involving defendants' immunized conduct,

what remains of plaintiffs' direct evidence allegations is

---

[19]    Plaintiffs' analogy to United States v. Columbia Pictures Indus., 507
F. Supp. 412 (S.D.N.Y. 1980), fails to correct this deficiency and show that
implementation of Resolution 001w would be "an illegal price restraint" even
if it "did not set specific prices."  (See Pls. Mem. at 20-21.)  The Columbia
Pictures court found that defendants' agreement to use a "rather complex
allocation formula" to value films they had contributed to a joint venture
constituted an illegal price restraint under the Sherman Act.  See Columbia
Pictures, 507 F. Supp. at 420 ("The movie companies have thus agreed on the
price for their motion pictures, replacing the prices that would normally be
set by the marketplace with a transaction between themselves and [the joint
venture] that places a value on each film within a minimum and maximum range,
and allocates revenues to the movie companies for their pictures by a
formula.").  Here, the Complaint does not allege the use of a common pricing
formula, or any formula to set fuel surcharges.  Therefore, Columbia Pictures
is factually distinct and inapplicable to this case.

insufficient to state a plausible claim for conspiracy and survive a Rule 12(b)(6) motion to dismiss.

### 2.    Allegations of Parallel Conduct

In the alternative, plaintiffs contend that the Complaint states a viable claim based upon allegations of parallel conduct supported by a factual context giving rise to an inference of illegal agreement to fix prices. (See Pls. Mem. at 18-22.) Twombly made clear that "[a]n allegation of parallel conduct . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief." Twombly, 550 U.S. at 557 (internal quotation and citation omitted). Indeed, as the Court noted, "[a] statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." Id.

Thus, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a *context* that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Id. (emphasis added); see also Starr, 592 F.3d at 328

(Newman, J. concurring) (noting that "[i]t is the context in which the defendants' parallel conduct occurred" which caused the "rejection of the complaint in <u>Twombly</u>").  Yet, despite the need to show some factual context supporting a plausible inference of conspiracy, at the motion to dismiss stage a plaintiff need not allege facts that fully exclude "independent self-interested conduct as an explanation for defendants' parallel behavior."  <u>See</u> <u>Starr</u>, 592 F.3d at 325.

Rather, to allow an inference of conspiracy to arise from allegedly parallel conduct, <u>Twombly</u> contemplates a "factually suggestive" context involving some sort of anomalous behavior on the part of defendants.  <u>See</u> <u>Twombly</u>, 550 U.S. at 557 n.5 ("to enter the realm of plausible liability" an allegation of parallel conduct requires some factual enhancement that crosses it from "the factually neutral" to "the factually suggestive").  For example, the <u>Twombly</u> court catalogued various factual contexts which could create such an inference of conspiracy including: (i) "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"; (ii) "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"; and (iii)

31

"complex and historically unprecedented changes in pricing

structure made at the very same time by multiple competitors,

and made for no other discernible reason" other than collusion.

See id. at 557 n.4 (internal citations and quotations omitted).

Here, it is dubious at the outset as to whether the

conduct alleged in the Complaint can accurately be characterized

as "parallel." (See Defs. Mem. at 15-17; Defs. Reply Mem. at 6-

8.) Defendants contend that "when corrected for currency

differences, the surcharges alleged in the Complaint are

divergent (in some instances varying by a factor of three), not

parallel and were not imposed in tandem, but in some instances

weeks apart." (See Defs. Reply Mem. at 6-7 (citing Compl. ¶¶

73-83).) Further, defendants note that contrary to plaintiffs'

claims of "uniform" parallel behavior, in several instances

plaintiffs plead disagreement among defendants, (see Compl. ¶¶

73-86), action by only some defendants and no action by other

defendants, (see id. ¶¶ 72-88, 81-82), or action by a solitary

defendant, (see id. ¶ 74). (See Defs. Mem. at 6-8.) Plaintiffs

counter that "[a] finding of illegal price fixing . . . does not

require a showing of perfectly synchronous conduct." (See Pls.

Mem. at 20.)

The court agrees that illegal price fixing need not be

exactly simultaneous and identical in order to give rise to an

inference of agreement. See, e.g., City of Moundridge v. Exxon Mobil Corp., No. 04-CV-940 (RWR), 2009 U.S. Dist. LEXIS 123954, at *20 (D.C. Cir. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms."); see also In re Baby Food Antitrust Litig., 166 F.3d 112, 132 (3d Cir. 1999) ("[P]arallel pricing does not require 'uniform prices,' and permits prices within an agreed upon range.") (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222 (1940) ("Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible.")).

However, the court need not decide whether plaintiffs have sufficiently alleged parallel conduct, for even assuming, arguendo, that defendants' imposition of fare increases and surcharges was parallel, plaintiffs have failed to allege a factual context that supports an inference of conspiracy as required by Twombly. See id. 550 U.S. at 557. Indeed, unlike the examples enumerated in Twombly, defendants' purportedly parallel behavior as alleged in the Complaint is not of the type that "would probably not result from . . . independent responses to common stimuli" nor does defendants' imposition of surcharges comprise "complex and historically unprecedented changes in pricing structures . . . made for no other discernible reason"

33

than the presence of illegal agreement. See Twombly, 550 U.S. 557 n.4 (internal quotations and citations omitted).

Rather, as alleged in the Complaint itself, the factual context, and indeed defendants' actions therein, involved rapidly rising jet fuel prices – an obvious potential "stimuli" and "discernible reason" aside from collusion that plausibly could have instigated independent decisions by defendants to impose surcharges. (See Compl. ¶¶ 72, 74, 82.) Thus, the Complaint lacks the types of anomalous behavior identified by the Twombly court as strong indicia allowing an inference of conspiracy. See Twombly, 550 U.S. at 557 n.4; see also In re Elevator Antitrust Litig., 502 F.3d at 51 (finding that allegations of parallel conduct including similarities in contractual language, pricing, and equipment design "do not constitute 'plausible grounds to infer an agreement' because, while that conduct is 'consistent with conspiracy, [it is] just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market'") (quoting Twombly, 550 U.S. at 554.)

For the same reasons the instant case is analogous to Twombly and Elevator Antitrust Litigation in failing to allege a factual context that plausibly gives rise to an inference of conspiracy, this action is different from Starr, 592 F.3d 314,

34

in several crucial respects.  In <u>Starr</u>, the Second Circuit
reversed the dismissal of an antitrust case against major record
labels finding that the "present complaint succeeds where
<u>Twombly</u>'s failed because the complaint alleges specific facts
sufficient to plausibly suggest that the parallel conduct
alleged was the result of an agreement among the defendants."
<u>Starr</u>, 592 F.3d at 323.  The <u>Starr</u> court first noted the array
of non-conclusory allegations of defendants' parallel conduct
including parallel pricing at unreasonably high levels, mandated
customer adherence to unpopular Digital Rights Management
("DRMs") terms for music purchases through either joint ventures
established by defendants or entities not controlled by
defendants, failure to respond to dramatic cost reductions with
price reductions as would be expected in a competitive market,
enforcement of a wholesale price floor[20] through the use of Most
Favored Nation ("MFN") clauses in their licenses, and a
collective boycott against the number two internet music
provider.  <u>Id.</u> at 318-19, 323.

But "more importantly," the <u>Starr</u> court found that the
complaint in that case succeeded because of allegations which,

---

[20]     The <u>Starr</u> court first noted that the allegation regarding defendants'
adherence to a price floor was "obviously conclusory" (<u>Starr</u>, 592 F.3d at 319
n.2), but later listed defendants' use of MFNs to "enforce a wholesale price
floor of about 70 cents per song" as an example of plaintiffs' "non-
conclusory factual allegations of parallel conduct," (<u>id.</u> at 323).

"taken together, place[d] the parallel conduct 'in a context
that raises a suggestion of a preceding agreement, not merely
parallel conduct that could just as well be independent
action.'" Id. at 323 (quoting Twombly, 550 U.S. at 557).
Specifically, the Starr court observed, *inter alia*, that the
defendants' own conduct suggested the existence of a conspiracy
because defendants attempted to conceal their MFNs in a "secret
side letter" and also that the same alleged price-fixing conduct
at issue in the complaint was the subject of investigations by
the New York State Attorney General as well as the DOJ. Starr,
592 F.3d at 324. Further, the Starr court noted that some kind
of illegal agreement could be inferred as the only rational
explanation for defendants' adherence to such unreasonable
prices and DRM conditions for customers that one industry
commentator noted that "nobody in their right minds" would want
to pay the fees and adhere to the DRM conditions in order to use
the defendants' internet music services. Id. Moreover, the
Starr court noted that defendants continued to charge
unreasonably high prices despite substantial decreases in costs.
Id. (citing Richard A. Posner, Antitrust Law 88 (2d ed. 2001)
("Simultaneous price increases . . . unexplained by any
increases in cost may therefore be good evidence of the
initiation of a price-fixing scheme.")). The factual

allegations in <u>Starr</u> mirror the types of anomalous behavior also
outlined in <u>Twombly</u>, 550 U.S. at 557 n.4, and are absent in the
instant action.

Indeed, the facts here are plainly distinguishable.
First, the questionable allegations of parallel conduct here do
not match the brazen parallel pricing, price floors, lockstep
price increases, and use of joint ventures linking each
defendants' financial interest to all others, as found in <u>Starr</u>.
<u>See</u> <u>Starr</u>, 592 F.3d at 318-19, 323.  Additionally, and as
defendants point out, rather than eliciting inferences from
defendants' attempts to conceal their allegedly illicit
activities behind the "thicket of 'secret' conspiracy-specific
MFN agreements" as in <u>Starr</u>, plaintiffs here seek to draw
inferences from defendants' open participation in regulated,
recorded, antitrust-immunized trade association meetings such as
the IATA tariff conferences.  (<u>See</u> Defs. 2/8/10 Ltr.)  Also, as
discussed further below, unlike <u>Starr</u>, where defendants were
simultaneously subject to multiple investigations for the very
conduct at issue in the complaint, here the allegations
regarding other investigations are generally inapposite.

Finally, and most importantly, unlike <u>Starr</u>, 592 F.3d
at 324, or the examples provided in <u>Twombly</u>, 550 U.S. at 557
n.4, here plaintiffs' Complaint does not allege the type of

37

anomalous actions giving rise to a strong inference of conspiracy because there could be no other "discernible reason" for such behavior. Rather, in the instant case plaintiffs themselves have alleged that defendants were "facing increased jet fuel costs" when they allegedly imposed surcharges, and that after fuel costs fell, some – but not all – defendants reduced their surcharges. (See Compl. ¶¶ 72, 74, 82.) This kind of independent and individualized rational response to common external stimuli does not suffice to create the factual context necessary to give rise to an inference of unlawful agreement. Cf. Starr, 592 F.3d at 327 (given that "plaintiffs have alleged behavior that would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals'," rejecting defendants' argument that agreement implausible on grounds that defendants' conduct "would be entirely consistent with independent, though parallel, action") (quoting 7 Areeda & Hovenkamp § 1415a (2d ed. 2003).

Thus, because plaintiffs' allegations of parallel conduct here are not "placed in a context that raises a suggestion of a preceding agreement, [but] merely [suggests] parallel conduct that could just as well be independent action," Twombly, 550 U.S. at 557, plaintiffs' allegations of parallel

conduct fail to allege a plausible conspiracy claim under Section 1 of the Sherman Act.

### 3. Allegations of Other Allegedly Anticompetitive Conduct

Finally, plaintiffs' host of allegations regarding other purportedly anticompetitive conduct by defendants and others are patently insufficient for several reasons.

First, the allegations regarding violations of the conditional immunities afforded to Global Alliance members, (Compl. ¶¶ 33, 44), even if true, would not give rise to a violation of Section 1 of the Sherman Act which is the basis of plaintiffs' Complaint. Second, plaintiffs' allegations regarding the air *cargo* surcharges at issue in Resolution 116ss occurred in August 1997, long before the class period here allegedly began in 2004, and plaintiffs fail to establish any probative connection between the air cargo surcharges in Resolution 116ss and the *passenger* fuel surcharges imposed during the class period at issue here. Similarly, the vague allegations regarding pending investigations based on interviews with unidentified individuals and a subpoena, (see Compl. ¶¶ 16, 89, 90), are not probative of the Sherman Act Section 1 violations alleged here because neither mere participation in an investigatory interview nor the receipt of a subpoena is

necessarily probative of conspiracy.  See, e.g., In re Graphics

Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1024

(N.D.Cal. 2007) (investigation alone "carries no weight in

pleading an antitrust conspiracy claim").  Third, public records

reveal that the allegations involving actual guilty pleas

referenced in the Complaint, (¶ 91), concerned unrelated markets

(such as for flights between the United States and Korea) or

only non-parties to this action (such as British Airways and

Virgin Atlantic Airways).

Finally, none of the remaining allegations regarding

antitrust investigations by various global authorities against

defendants and other non-parties to this action even relate to

the transatlantic passenger surcharges at issue in the

Complaint.  (See Compl. ¶¶ 92-93.)  As such, there is no basis

from which to infer that those localized investigations or

proceedings involving other products (such as air cargo fares)

implicate defendants in the conspiracy plaintiffs allege here

with respect to passenger fares and surcharges in the

transatlantic market alleged in the Complaint.  See, e.g.,

Elevator Antitrust Litig., 502 F.3d at 52 (rejecting conclusory

"if it happened there, it could have happened here" logic based

on allegations of anticompetitive wrongdoing in Europe absent

any evidence of linkage between such foreign conduct and conduct here).

Thus, because the allegations in the Complaint, "however true," do not allow the court to infer any "more than the mere possibility of misconduct," dismissal here is required. See Starr, 592 F.3d at 321 (quoting Iqbal, 129 S. Ct. at 1950); see also Twombly, 550 U.S. at 570 (where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed"). The court cannot sanction an enormously expensive and time-consuming discovery expedition involving "hundreds of thousands" of class members and flights on a mere possibility. See Twombly, 550 U.S. at 558 (when, "however true," the allegations in a complaint "could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court") (internal quotation and citation omitted).

## II. The Issue of Re-pleading

Plaintiffs have already twice amended the pleadings in this action. (See Doc. Nos. 1, Complaint; 6, Amended Complaint; Doc. No. 17, Second Amended Complaint.) After their third attempt to sufficiently plead a cause of action, plaintiffs have neither requested any further leave to re-plead nor suggested

any additional facts that would merit an amended pleading.[21]

Accordingly, this case is dismissed finally, with prejudice, and

without leave to re-plead.  See Horoshko v. Chase Manhattan

Mortgage Co., 373 F.3d 248, 249 (2d Cir. 2004) (per curiam)

(finding that absent any request for leave to amend and "'some

indication as to what appellants might add to their complaint in

order to make it viable,'" amendment is not warranted and the

"District Court was under no obligation to provide [plaintiffs]

with leave to amend their complaint, much less provide such

leave *sua sponte*" and rejecting as "frivolous" claim that

district court abused its discretion in not permitting an

amendment that was never requested) (quoting Nat'l Union of

Hosp. & Health Care Employees v. Carey, 557 F.2d 278, 282 (2d

Cir. 1977)); see also Trautenberg v. Paul, Weiss, Rifkind,

Wharton, Garrison LLP, No. 08-2010-cv, 2009 U.S. App. LEXIS

22454, *4 (2d Cir. Oct. 13, 2009) (finding that district court

did not abuse its discretion by failing to grant plaintiff, *sua

sponte*, leave to re-plead given that plaintiff did not move for

leave to re-plead in opposition to defendant's motion to dismiss

his original complaint with prejudice); Anatian v. Coutts Bank

---

[21]     Although, as noted *supra*, plaintiffs' motion papers raise certain
allegations not contained in the Complaint, even if the Complaint were
amended yet again to include such allegations, the Complaint would still fail
to cure the deficiencies identified *supra* and state a plausible claim for
relief sufficient to withstand defendants' motions to dismiss.

42

(Switz.) Ltd._, 193 F.3d 85, 89 (2d Cir. 1999) ("we will not deem it an abuse of the district court's discretion to order a case closed when leave to amend has not been sought") (internal quotation and citation omitted).

## CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the Complaint is granted in its entirety and the action is dismissed without leave to re-plead. The Clerk of the Court is respectfully requested to enter judgment in favor of defendants and to close this case.

**SO ORDERED.**

Dated:     April 5, 2010
           Brooklyn, New York

                          _____/s/_____
                          KIYO A. MATSUMOTO
                          United States District Judge